Chief Justice Robertson
delivered the opinion of the court.
Robert Sanders died in 1805. He left a large estate, which he devised to his children-. The will directed the residuum of his estate, which should remain after discharging some specific legacies and paving debts, to be distributed among his children, whenever the youngest of them (Walker Sanders,) should marry, or become twenty one years of age. It also directed, that Peter Gatewood should live on the farm on which the testator died, keep (he stock, slaves, &c. together, carry on the business of the farm, and rear up the children. David Flournoy, John Thompson,, and Peter Gatewood, had the will proved in May, 1805, and qualified as the executors.
The personal estate and slave's were appraised to $> 13,963. Seventy-four horses were appraised; some of these were retained by Gatewood on the farm, and the others were sold. It seems that Thompson attended to the sale, and was charged by bis co-executors with the collection and payment of debts.
Scarcely any thing was sold by him, except the horses. These, being bred from a favorite stock, sold high; generally much higher than their appraised values. But no sale-hill ever having been returned to the county court of Scott, and none appearing in this case, the total amount of the sale is not certainly ascertained. It is variously estimated at from $6,262 26 cents, to $9,000. Thompson himself says that it was $6,262 26 cents. The sale was on a credit of twelve months.
In 1818 a sale was made, by Gatewood, of a portion of the personal estate in his possession. He was to receive, by direction of the will, $250 for the first year, and such compensation afterwards as his co-executors should deem reasonable and adequate. The proceeds of the farm and stock, and slave hire, were *95 considerable: as were also his annual disbursements and charges.
In 1819, Walker Sanders being twenty-one ^ears old, he and the other devisees tiled (heir bill -in chan-cerv against the executors, for an account and distribution. At the October term, 1819. of the county court of Scott, shortly after the filing of the bill, commissioners were appointed by the county court, at tiie instance of Thompson and Gatewood, to set'le with them. They reported, that the estate owed Gatewood $1 10 cents, and Thompson $41 75 cents, after charging them with every thing with which they were, by law, chargeable.
In their answers, Thompson and Gatewood relied on the settlement by the county court, which-they both represented as true and just. Flournoy denied, that any' portion of the estate ever came to his hands. The circuit court, considering the county court settlement final, and conclusive, dismissed the bill.
On an appeal to this court, this decree was reversed, because the settlement was made after the filing of the bill; and the cause was remanded for an account- “dé novo,” without regarding the settlement. See the opinion reported in If Little’s reports, 314.
On the return of the case to the circuit court, commissioners were appointed {o audit the accounts,and report the result to the court. They met in Frankfort in February, 1824, and proceeded (the parties being present,) to the examination of the vouchers.
It seems, that neither the devisees, nor Thompson» had expected any difficulty in settling with him. They were dissatisfied with Gatewood; and believing that he had not rendered a fair and just account, the bill was filed, chiefly for the purpose of coercing from him, what they believed to be due to them from the executors; supposing, as they did, that whatever was due to them was justly due by him.
No testimony had been taken before the commissioners met. Supposing that the settlement with Thompson would be easy, and more a matter of form than of substantial importance, the commissioners commenced with his accounts. To their and his surprise, difficulties occurred, for want of proper vouch? *96 ops or sufficient proof; and he left Frankfort for the avowed purpose of procuring the requisite testimony, In a few days afterwards he was prostrated by a paralysis, which rendered him mentally, as well as phy-sica|iVi un:ible to attend to the investigation of his accounts, or any other business. His physicians deemed his case desperate, and interdicted ail intercourse with him on business. The commissioners hearing of his condition, granted some indulgence, but would not consent to postpone their report beyond the approaching term of the circuit court.
Thereupon, Mr. Shepherd was sent to Frankfort to attend to the examination for Thompson. Without regular proof or vouchers, the commissioners went on until some time in March, when they closed their investigations and made out their report. By this report, the estate is made debtor to Gatewood .$1,119 72i cents, and a balance is charged against Thompson of $> 10,309 151 cents, more than half of which is interest, computed from 1806, on the whole estate with which he was charged.
The commissioners charged Thompson with $9,000, as the amount of the sale of 1805; and also, among other things, charged him with $1,510 03 cents, said to have been received by him from Gatewood, for payment of certain debts; and $2,029 61 cents, said to have been received by him out of the proceeds of the sale of 1818. They withheld from him any compensation for his trouble and time, and refused to allow any thing for money expended in his personal atlenlion to the estate. And the following credits, claimed and allowed by the countv court commissioners, were d'.--aSlowed: $217 paid to Richardson Allen; $.30 to William Johnson; $141 30 cents to Benjamin Johnson; and $341 30.cents, also to Benjamin Johnson. The commissioners believed, that either these claims were spurious or had hot beenpaid;and there are some grounds for suspicion in regard to them.. The report was made at the March term 1824.
At the June term 1824, a motion was made by the counsel of Thompson, to quash the report, upon affidavits filed, stating the inability of Thompson to attend to his business; and representing that, if time were allowed, proof could be obtained, which would *97 reduce the amount at which the commissioners had fixed the sale of 1805, and would establish (he rejected credits. The court refused to quash the report; but gave time until the next term, to procure evidence on the contested items in the report.
At the Ocfobe,r term, 1824, an affidavit of Dr.'Sal-stinstall, who was the agent of Thompson for attending to this case, was filed, representing that Thompson had not been relieved entirely from the eifects of ■the paralysis; and that he himself had industriously attended to his business, and procured some testimony; but for the want of correct information, and in consequence of the absence of some persons whose testimony would be very important, he had been unable to establish facts which were material, and which he would be able to establish if he could be indulged with a continuance. Á motion was made for a continuance, but overruled, and a final decree was rendered in favor of Gatewood for $¡1,750, and against Thompson for $8,976 40-cents.
In August, 1824, Thompson sold and conveyed a tract of land to Hawkins, and a tract to Chambers; for the first of which, payment was made by assuming to pay certain debts due by Thompson; for the second, Thompson received the promissory notes of Benjamin Smith for $2,500, which were assigned to Roger Quarles; who took a mortgage on the land to secure the $2,500, and another mortgage on another tract of land, and two slaves belonging to Thompson, to secure the payment of a debt alleged to be due from Thompson to him. About the same time, Thompson sold or conveyed away the remainder of his estate, some of which was transferred to his son George.
At the October term of the Franklin circuit court, 1824, Sanders5 heirs filed a bill, supplemental to their bill against the executors, charging, that the sales by Thompson, of his property, were fraudulent; and that the assignment of the notes to Quarles was fraudulent, and merely colourable. They made Thompson, Quarles, and Chambers, defendants.
Thompson positively denied, in his answer, that he had been guilty of any fraud; and averred, that he sold his property honestly, to pay his just debts, and. *98 to enable him to remove to Christian county in this state, whither he had subsequently removed5 that knowing, that his estate must be sold, he deemed it prudent to make sale of it by private contract, for the ¡)es(. pr¡ce which he could obtain; and that, having borrowed ,$5,000 of Quarles, the assignment and were executed to secure the reimburse» ment of it.
Quarles also denied any fraudulent act or purpose on iiis part; stated, that on the 7th of April, 1824, he loaned to Thompson ,$5,000, in Commonwealth notes, for which he held his note of that date; that the loan was bona fde, and the assignment and mortgages were for a fair and valuable consideration.
^Chambers also answered, and denied fraud.
The court decreed, that the assignment of the notes and the mortgage, by Thompson to Quarles, were fraudulent; and decreed, that the debt due by Smith, and the land mortgaged by Thompson to Quarles, should be subjected to the decree in favor of Sanders’ heirs against Thompson.
Writs of error being prosecuted to reverse the decree in favor of the heirs against Thompson as executor, and-that against him and Quarles, the two cases have been consolidated by consent, and- are to be decided together.
We cahnot sustain the decree against Thompson as excutor, for-the following reasons:
Although the examination by the commissioners •was, virtually, ewpatte, Thompson objected to only a ■part of the items in the report, and time was allowed him to take .proof in relation to them. He has not shown satisfactory reasons for not taking additional proóf, nor does any sufficient reason appear for further indulgence. The affidavit of Salstinstall is not sufficiently explicit, and does not show good cause for -an extension of the time which had been allowed for proofj-and no reason, why Thompson himself did not •make an affidavit, has been shown or suggested. We therefore incline to the opinion, that the circuit court did not err in refusing to continue the cause on the affidavit of Salstinstall. Nor can we say that the court erred, in assuming the amount with which, as principal, the decree charges Thompson. The chief *99 iiern charged against him is for the property 9old in 1805. The sale-bill was never reported to the county court, and therefore there is some difficulty in ascertaining its precise amount. We have serious doubts whether it was as high as f9,000-. But as Thompson was guilty of reprehensible negligence, if not fraud, in withholding the sale-bill, and as is some evidence tending to prove that its amount was $9,000, we do not feel authorized to reverse the- des-cree for assuming that as the true amount.
An executor or administrator i- not bound to make distribution, until a refunding bond has been E-iven or tendered to him. An executor or administrator is nal chargeable with interest, unless he has made profit" out oí the estate, or refused, on a demand and tender of a sufficient refund-inst bond, to make distribution.
Whether Thompson paid any thing to Allen, or to W. Johnson, or whether the payments to B. Johnson were made in good faith, is left in some doubt. But as Thompson was indulged with time, which has not been shown to have been insufficient, for obtaining proof as to these items, it was not improper to withhold any credit for them.
But the circuit court erred in charging interest from 1806. There is nothing in the record which will justify a charge for interest so far back as 1806.'
It is a general rule of equity, that an executor or' administrator is not chargeable with'interest on the funds in his hands, unless he shall.have appropriated them to his own use. He is chargeable with the debts due by his testator or intestate; he has therefore a right to retain the assets in his hands, to enable him to make prompt payments of debts; and he is not bound to make distribution until a refunding >ond shall have been given or offered to him; unless, therefore, he shall have made profit out of the estate, or refused to make distribution on demand,and atender of a sufficient refunding bond; he should not be charged with interest. See Webb’s Cox, sel. ca. 477.
In this case there is no positive evidence, tending to prove that Thompson ever loaned, or otherwise appropriated to his own use, any portion of the funds in his hands, prior to 1815; nor is it intimated that distribution was ever demanded, until aboutthe time when this suit was instituted. Indeed, it appears that the distributees were infants; and it does not appear that they had guardians, to whom Thompson could have surrendered the distributable fund, which may be presumed to have remained in his hands,
An allowance to auditors of $5per <hem, dny-'Hervices,. is unreasona-ordin-Sh,’ia' oasés.1^'
But as iri 1815 his ro-expcutor, Gatewood, advanced to him $' 1,516' 03-rents, for the purpose of paying debts, and’which he applied to that use, we are authorized.to infer, that Thompson had made use of the funds-}laf¡ COme tohis hands prior to that time; and that, consequently, he had applied them to his own use, except so far as he has been able to show an appropriation of them towards the payment of the debts of the testator. We are therefore of opinion, that interest should be charged on the balance whidh ought to have been in Thompson’s hands, to commence at. the time when Gatewood made the advance to him in 1815. Interest should not: be charged on the sum then received from Gatewood; because it appears that Thompson applied it to the payment of debts.
The allowance to the auditors seems to be unusually and unreasonably high. They charged five dollars each per day, for about forty days! There is no ;n rec0rd which would justify Such a compensation, to three men for so long a time. And it is somewhat singular that, whilst they considered their services worth such a sum for such a period, they withheld from Thompson any compensation for his services for fourteen years, and any allowance for disbursements- made by him in attending to Jaw-suits, and other business of the estate.
We presume that the circuit court made an allowance to Thompson for bis services, or at least, for disbursements made by him in expenses.. The total amount decreed against him is less than that reported by the auditors. The difference is $>1,332 7Sf. An account was exhibited by Thompson for about that sum. As we have no sufficient data for determining whether the allowance thus made is exactly just and proper; and as the defendants have not complained of it, we .do not feel disposed to disturb the decree on that point.
Executors should be held to a Icgafand upright performance of their trusts. They are frequently negligent, and profit by the improper use of estates confided to their care. Thompson, in this case, has shown extreme negligence, ii nothing worse. The heirs of Sanders have been unreasonably delayed, and *101 subjected to unnecessary trouble, vexation, and expense. But it seems to us that, at least, the decree which they obtained is unwarrantable,in the particulars which have been noticed. There is much room to doubt, whether it is not unjust in other respects. But Thompson has no right, under all the circumstances, to complain of a rigid and jealous tion of his acts, and of a disposition to exact the maximum of the severest justice. It may be strange,that $1,750 have been decreed to Gatewood, who insisted that the first settlement was correct, which brought the heirs in his debt to the amount of less than two dollars; and that Thompson, who was reported to be a creditor to the amount of forty dollars, should now be ascertained to be debtor to the amount of about $8,000. But the defendants have not complained of the decree in favor of Gate wood, and we cannot therefore investigate it, for the purpose of ascertaining whether it is right or wrong.
And Thompson’s negligence has been such, as to deprive him of any just cause to complain of the decree as erroneous, to any greater extent than so far as we have already said that it is erroneous.
But the decree has transcended a just application of even the severest rule of equity; and therefore it must be reversed. This will be done with less reluctance, because, although justice has been already postponed too long; yet as the decree has not been suspended by supersedeas or appeal, we may presume that it has been enforced; and that, therefore, a reversal, for the purpose of making (he corrections which have been suggested, cannot eventually operate unjustly to the defendants.
Wherefore, the decree against Thompson is reversed, and the case remanded, with instructions to render a decree conformable to this opinion.
The decree against Quarles presents a difficult question. There are some circumstances which might excite strong suspicions, of a fraudulent combination between Thompson and Quarles; but these, we are inclined to think, are insufficient to justify a decree which must convict (wo men directly, and a third virtually, of not only fraud, but of perjury,
*102 Quarles is the relation of Thompson, by marriage* He assisted Salstinstall in some agency for Thomp* son, in his business, during his disability. He knew of the pendency of the suit, against Thompson as ex-' ecu[orof ganders; and it ought not to be doubted,that' he knew that the commissioners had made their report, and understood the tenor of the report. ■ In a deposition which he had given in the suit, being asked whether Thompson had received the amount for the sale of the land to Chambers, he answered first that he had; but afterwards, on the suggestion of the attorney who drew the mortgages, he explained, by stating the transaction substantially as set forth in his answer. The notes which he said he had loaned to Thompson, were at a depreciation of fifty per cent, when loaned; and the note on Smith, for $2,500 in specie; and that on Chambers for $295, were credited as $2,795, on the note for $5,000, which had also been drawn payable, in dollars. The alleged loan was only a few days after the report of the commissioners was returned to court. The subscribing witness swore, that, being called into Quarles’ house, to attest the note after it was written and signed; Thompson told him that it was for borrowed money; but that he saw none. These are the most prominent facts, from which it has been inferred, that the whole transaction was only colorable. And they will create suspicion wherever they are told.
On the other side; it was proved by Salstinstal! that he was present when the money was loaned, and counted it. He said, that before that time Quarles had loaned to Thompson $200; and on that day he counted $4,800, which were delivered to Thompson by Quarles before the execution of the note. Thompson professed to be anxious to sell his property, for the purpose of being ready and able, without sacrifice, to meet all his liabilities; and expressed a wish to procure money not only for the purpose of paying sundry debts which he owed, and of being prepared for a decree against him in favor of Sanders’ heirs, but of buying land in Christian, whither he contemplated a removal. Both he and Quarles admit in their answers, that the loan was i t notes of the Bank 'of the Commonwealth. They both state, that the reason why the credit was endorsed for only $2,750,, *103 ■was, that the notes on Smith were not due; and it -was uncertain what the difference between specie and Commonwealth’s paper would be, when Quarles should collect the amount of Smith’s notes; and they also state, that it was agreed, if Quarles should ever collect the whole amount of the notes for $2,500 from Smith, then the note for $5,000 should be credited with whatever the payment by Smith should be worth in paper, at the time of making it. The honor and veracity of Quarles stand unimpeached, except so far as they may be questioned by the circumstances in this case. His ability to loan a much larger sum is not doubted. Both he and Thompson swore positively, that the note was executed in consideration of the loan of $5,000, in Commonwealth’s paper; and thatthe whole transaction was untinctured with fraud.
That the money was counted, and actually delivered to Thompson, we are not permitted to doubt judicially; aud this opinion does not impugn the testimony of the subscribing witness in the slightest degree. He was not present when the notes were counted and delivered; he was called in from his work only to subscribé'his name as a witness. This is no badge of fraud; it is rather a circumstance indicative of the fairness of the parties. If they intended a fraud, they would have been apt to have counted the notes in the presence of this witness, or shown them to him; and if a fraud were intended, it seems likely that Quarles, and Thompson, and Salstinstall, would have sworn that the $5,000 were specie.
The answer of Quarles in his deposition, was substantially true. Thompson had virtually received the price of the land sold to Chambers. The money had not been actually paid to him; but the $2,500 had been appropriated to the payment “pro tanto" of Quarles’ note, which was in effect a payment to Thompson. The object of the question put to Quarles, was to ascertain whether the money was still ■due to Thompson; knowing that it was not, he answered affirmatively, ihat the price for the land had been received by Thompson, without at first explaining how it was received.
An analysis of all the minute circumstances, tending to prove or to disprove fraud, would be tedious .and perhaps unprofitable.
*104 We do not feel ourselves at liberty to decide that there was actual fraud.
Although Quarles must be presumed to have known that the report, had been made to the circuit court; still he was not guilty of fraud, unless he either did not, in fact, lend the money, or knew that Thompson was selling his land, and arranging the payment by assignment to him, for the purpose of defrauding the heirs of Sanders. And it is on ttiis point that we have felt file most difficulty. Wo believe that Thompson intended to shield his property from the expected decree; but this design will not affect Quarles,if he were unapprised of it when he made the loan. The relations of amity anti confidence which subsisted between them, and the knowledge which Quarles must hence be presumed to have had, of the condition and purposes of Thompson, might, in the abstract, incline us strongly to the opinion that he was assisting Thompson to cover his property. But it is shown that others, who must have been acquainted with Thompson'1 s condition,, and were intimately acquainted, with' him, did not suspect until since August, 1824, that he. had any other than honorable ana prudential motives for disposing of his estate. 'Quarles’ character has not been called in question.; for aught that appears, it is free from reproach or suspicion; we should therefore be more inclined to believe, that he did not know of any contemplated fraud by Thompson, when he loaned the money to him, than that he and Thompson were both guilty of perjury superadded to fraud.
Against two such answers as theirs, two positive witnesses would scarcely be sufficient. The circumstances tending to show fraud, and those repelling them, are nearly equipollent. However important therefore it may be, to the cause of justicp and morality, that frauds shall be discountenanced and exposed, as it is equally so.that character should be preserved from unjust reproach, and the rules of evidence applied to all cases impartially, we cannot concur with the circuit court, that suspicion is proof, and decide an our oaths of office, that Quarles is guilty of fraud.
Wherefore, the decree in this case also is reversed, and the case remanded, with instructions to dismiss so much of the supplement bill, as prays for a decree *105 «gainst Quarles, for the notes of Smith'and Chambers; and with instructions also, to suffer such amendments to be made, as will enable Quarles to reclaim the amount which shall have been coerced from him under the decree,provided it has been enforced; and as shall enable all the parties to settle finally, so far as 'the claims and mortgages of Quarles may be concerned; and so "that he may be secured in his own, and not be permitted to claim any more.
Tuition for a", re"!iearin£“
Denny, Wickliffe, and Wooley, for plaintiffs; Hoggin, Crittenden, and Sanders, for delendants.